UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

WILLIAM BISHOP and
JUANITA BISHOP,

        Plaintiffs,

v.                                    Civil Action No. 2:09-1076

QUICKEN LOANS, INC.,

        Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

        Pending is the motion for summary judgment of defendant
Quicken Loans, Inc. ("Quicken" or "Quicken Loans"), filed January
11, 2011.

I.  Background and Procedural History

        Plaintiff William Bishop is a veteran and retired coal
miner.  (Quicken Loans Mot., Ex. B, W. Bishop Dep. at 10:24-
11:3).  His wife, plaintiff Juanita Bishop, was primarily a
homemaker, raising the couple's six children.  (Pls.' Resp., Ex.
A, J. Bishop Dep. at 14:6-10).  Both Mr. and Mrs. Bishop are high
school graduates.  (<u>Id.</u> at 20:24; <u>Id.</u>, Ex. B, W. Bishop Dep. at
9:16-17).  They earn a fixed monthly income of approximately
$4,165, consisting of retirement pensions and Social Security
benefits.  (<u>Id.</u>, Ex. B, W. Bishop Dep. at 12:7-16; <u>Id.</u>, Ex. A, J.

Bishop Dep. at 21:9-23).

In 1994, plaintiffs purchased their home in Beckley, West Virginia, for $60,000.  (<u>Id.</u>, Ex. A, J. Bishop Dep. at 8:16, 34:12).  Plaintiffs co-own the Beckley property.  (Compl. ¶ 2). They refinanced the property twice with Bank One Corporation, once in 2002 and again in 2004 (the "Bank One Loans").  (Quicken Loans Mot., Ex. A, J. Bishop Dep. at 43:7-8, 44:16-18).  From May 2005 to December 2006, plaintiffs refinanced their home three times with defendant Quicken Loans.  Each time only Mr. Bishop signed the note or notes, but both Mr. and Mrs. Bishop signed the deed of trust securing the obligation.

Plaintiffs' dealings with Quicken Loans are at the center of this dispute.  Four counts are alleged in the second amended complaint.  In Count I, Unconscionable Conduct, plaintiffs ask that the third Quicken loan be declared unconscionable.  In Count II, Illegal Loan, plaintiffs allege that Quicken (1) imposed illegal origination and investigation fees twice within a twenty-four month period and (2) issued two mortgage loans (the second and third loans) that exceeded the fair market value of plaintiffs' property.  Count III, Fraud, relates to the rate of interest imposed on the third loan.  Count Four, Fraud, relates to an inflated appraisal furnished by an

2

appraiser from Quicken Loans' sister corporation for the second and third loans.

**A.   The May 2005 Notes**

        In the spring of 2005, after seeing an advertisement on television, Mrs. Bishop (who handled the couple's finances) contacted Quicken Loans about refinancing the Beckley property. (Pls.' Resp., Ex. A, J. Bishop Dep. at 49:5-11).  Plaintiffs were current on their mortgage payments at the time but indicated to Quicken Loans that they were interested in paying off their credit card debt and lowering their monthly mortgage payments. (Compl. ¶ 7).  To facilitate plaintiffs' attempt to refinance, Quicken Loans obtained an appraisal from appraiser William Whitehair of Whitehair Appraisals, Inc., an independent appraisal company located in Elkins, West Virginia.  On April 21, 2005, Mr. Whitehair valued plaintiffs' property at $112,500.  (Quicken Loans Mot., Ex. C at 2).

        On May 18, 2005, Mr. Bishop executed two Quicken Loans promissory notes in order to refinance the Beckley property (the "May 2005 notes").  (Id. at 12, 20).  The first was a Fixed Rate Note in the amount of $84,000, payable in 360 monthly installments beginning in July 2005 with an interest rate of

6.375%.  (Id. at 12).  Exclusive of tax or insurance escrows, plaintiffs' monthly payment under the Fixed Rate Note was $524.06.  (Id.).  The second note was a Fixed Rate Balloon Note in the amount of $15,000.  (Id. at 20).  The Fixed Rate Balloon Note had a fixed interest rate of 6.80%, resulting in a monthly payment of $97.79 and a balloon payment of $11,113.63 due after fifteen years.  (Id.).  The May 2005 notes were secured by deeds of trust on the Beckley property executed by both plaintiffs. (Pls.' Resp. at 18).

By refinancing, plaintiffs satisfied their preexisting mortgage loan in the amount of $66,870.93, as well as certain unsecured debt in the amount of $1,840.  (Pls.' Resp., Ex. C at 6).  Plaintiffs also secured a lower interest rate as compared to their prior mortgage loan and obtained $26,910.97 in cash. (Quicken Loans Mot., Ex. C at 15, 27).  The settlement charges incurred by plaintiffs in connection with the May 2005 notes totaled approximately $3,700.  (Pls.' Resp., Ex. C at 13).

B.    The July 2006 Notes

In 2006, John Snively of Quicken Loans contacted plaintiffs by e-mail about refinancing their property.  (Pls.' Resp., Ex. A, J. Bishop Dep. at 78:21-79:4).  Mr. Snively, who e-

4

mailed plaintiffs approximately once per month, apparently
indicated to plaintiffs that they could obtain a lower monthly
mortgage payment by refinancing the May 2005 notes.  (Id. at
79:1-4).  After plaintiffs expressed interest, Quicken Loans
requested that TSI Appraisal Services ("TSI"), an appraisal
management company, arrange for a full appraisal of plaintiffs'
property.  (Pls.' Resp., Ex. J, C. Bonkowski Dep. at 20:2-14).
TSI, which, like Quicken Loans, is a subsidiary of Rock Holdings
Inc., arranged for an appraisal of plaintiffs' property to be
completed by Kirk Riffe of Mountaineer Appraisals.  (Id.).  On
April 20, 2006, Mr. Riffe prepared an appraisal of the property,
indicating that its fair market value at the time was $153,000.
(Quicken Loans Mot., Ex. D at 18).  Quicken Loans reviewed and
approved Mr. Riffe's appraisal and conditionally approved
plaintiffs' loan application.  (Id., Ex. M, C. Bonkowski Dep. at
63:4-15).

On July 6, 2006, Mr. Bishop again executed two Quicken
Loans notes (the "July 2006 notes"), totaling $122,400.  (Id. at
1, 9).  The first was an Interest First Note in the amount of
$112,400 with an interest rate of 6.5%.  (Id. at 1).  The
Interest First Note provided for interest-only payments in the
amount of $608.83 per month for the first 120 months, followed by

monthly payments of $838.03 for the next 240 months.  (Id.).  The
second note was a Fixed Rate Balloon Note in the amount of
$10,000 with a fixed interest rate of 9.375%.  (Id. at 9).  The
Fixed Rate Balloon Note had monthly payments of $83.18, with a
balloon payment of $8,104.43 due after fifteen years.  (Id. at
11).  The July 2006 notes were secured by deeds of trust on the
Beckley property executed by both plaintiffs.  (Pls.' Resp. at
18).

       Plaintiffs used the proceeds from the July 2006 notes
to satisfy the balance of the May 2005 notes and certain
unsecured debt in the amount of $9,885.  (Pls.' Resp., Ex. C at
14).  Plaintiffs also received $5,536.28 in cash.  (Id.).  The
settlement charges accompanying the July 2006 notes totaled
approximately $8,300.  (Id.)

C.   The December 2006 Note

       In September 2006, Mr. Snively called Mrs. Bishop about
refinancing the property for a third time.  (Pls.' Resp., Ex. A,
J. Bishop Dep. at 79:2).  Mr. Snively represented to Mrs. Bishop
that by obtaining an adjustable rate note, plaintiffs could lower
their mortgage payment to approximately $450 per month.  (Id. at
79:8).  Mrs. Bishop explained that she and her husband did not

                                6

want an adjustable rate note, to which Mr. Snively responded that Quicken Loans would refinance the home again before the interest rate on the proposed note would increase.  (Id. at 79:13).  Based on Mr. Snively's representations, plaintiffs applied for another mortgage loan.  (Id. at 98:22).  On September 12, 2006, plaintiffs were conditionally approved for a seven-year, adjustable rate loan in the amount of $131,600.  (Quicken Loans Mot., Ex. E at 1-2).  On September 24, 2006, Kirk Riffe prepared another appraisal of the property for Quicken Loans, again indicating that its fair market value was $153,000.  (Id. at 3).

On November 15, 2006, Mrs. Bishop expressed concern that the proposed seven-year loan included private mortgage insurance, which would protect Quicken Loans in the event of default by plaintiffs and result in higher monthly payments. (Id. at 38).  As a result, on December 15, 2006, Mr. Bishop instead obtained from Quicken Loans a thirty-year Option Adjustable Rate Note in the amount of $133,600, with an initial interest rate of 6.250% (the "December 2006 note").  (Id. at 27). The December 2006 note, signed by Mr. Bishop only, gave plaintiffs the option to select among a variety of payment methods, including a fully amortizing repayment structure calculated over fifteen- and thirty-year terms, as well as the

7

option of making a minimum monthly payment of $361.83.  (<u>Id.</u> at

33).  Quicken specified in the December 2006 note, however, that

the loan was subject to "negative amortization," such that a

minimum monthly payment "will not be sufficient to pay interest

at [6.250%]" and that the deferred interest will both increase

the loan balance and accrue additional interest.  (<u>Id.</u>).  Both

Mr. and Mrs. Bishop executed the deed of trust securing the

December 2006 note.  (Pls.' Resp., Ex. I).

        The proceeds from the December 2006 note satisfied the

balance of the July 2006 notes; plaintiffs also received

$1,265.35 in cash.  (Pls.' Resp., Ex. C at 14).  The settlement

costs accompanying the December 2006 note amounted to

approximately $8,300.  (Quicken Loans Mot., Ex. E at 31).

D.   The Procedural History of this Action

        Plaintiffs began making monthly payments on the

December 2006 note of approximately $450, which equaled the

minimum monthly payment plus escrow payments.  (Compl. ¶ 23;

Quicken Loans Mot., Ex. E at 39).  At some point in 2008, they

learned that the minimum monthly payment under the December 2006

note "would more than double within 5 years" after the adjustable

interest rate increased.  (Compl. ¶ 23).  In March 2008,

plaintiffs contacted Quicken Loans and attempted to refinance their property to reduce the monthly payment.  (Pls.' Resp., Ex. A, J. Bishop Dep. at 103:1-104:8).  In April 2008, Brett Brotherton of the Southern West Virginia Appraisal Group prepared an appraisal of plaintiffs' property for Quicken Loans, indicating that the value of the house was $137,000.  (Quicken Loans Mot, Ex. I, at 5-6).  Inasmuch as the balance on the December 2006 note exceeded the property's appraised value, Quicken Loans denied plaintiffs' 2008 loan application.  (Pls.' Resp., Ex. A, J. Bishop Dep. at 103:3-23).

Plaintiffs allege that they learned the "true value" of their property in 2009.  (Compl. ¶ 27).  Specifically, in June 2009, plaintiffs hired Robert Wilson of Wilson and Associates, Inc., to perform a retrospective appraisal of the property. (Pls.' Resp., Ex. D).  On June 30, 2009, Mr. Wilson provided plaintiffs with his appraisal, which retrospectively valued the property at $100,000 as of December 2006.  (Id.).

Plaintiffs instituted this action in the Circuit Court of Kanawha County on September 2, 2009.[1]  (Notice of Removal at

---

[1] Also named as defendants in the second amended complaint were OneWest Bank, FSB ("OneWest"), the servicer of the Quicken Loans notes, and Deutsche Bank National Trust ("Deutsche Bank"), the subsequent holder of the notes.  By memorandum opinion and

1).  Quicken Loans removed on October 2, 2009, invoking the court's diversity jurisdiction.  (Id.).

## II.  Summary Judgment Standard

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those necessary to establish the elements of a party's cause of action.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A court must neither resolve disputed facts nor weigh the evidence, Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility.  Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986).  Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor.  Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979).  Inferences that are "drawn from the underlying facts . . . must be viewed in the

_____

order dated September 8, 2010, OneWest Bank was dismissed from this action.  On December 2, 2010, the court granted the parties' joint motion to dismiss Deutsche Bank as a party defendant.

light most favorable to the party opposing the motion."  <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962).

## III.  Analysis

A.   Count I: Unconscionability

Count I of the complaint seeks a declaration that the conduct engaged in by Quicken Loans was unconscionable, rendering the December 2006 note void and unenforceable.[2]  (Compl. ¶ 34). In addition to actual damages, plaintiffs seek civil penalties under § 46A-5-101 of the West Virginia Consumer Credit and Protection Act.  (<u>Id.</u>).

In West Virginia, the basic test for unconscionability is:

> [W]hether, in the light of the background and setting of the market, the needs of the particular trade or case, and the condition of the particular parties to the conduct or contract, the conduct involved is, or the contract or clauses involved are so one sided as to be unconscionable under the circumstances existing at the time the conduct occurs or is threatened or at the time of the making of the contract.

<u>Arnold v. United Cos. Lending Corp.</u>, 204 W. Va. 229, 511 S.E.2d

_____

[2] Plaintiffs' unconscionability claim appears to arise from Quicken Loans' conduct in relation to the December 2006 note only.  Accordingly, the court will not assess whether the May 2005 and July 2006 notes were unconscionable.

11

854, 860 (1998) (quoting Uniform Consumer Credit Code, § 5.108

comment 3, 7A U.L.A. 170 (1974)); see also Watkins v. Wells Fargo

Home Mortg., 631 F. Supp. 2d 776, 787 (S.D. W. Va. 2008); Herrod

v. First Republic Mortg. Corp., 218 W. Va. 611, 625 S.E.2d 373,

379 (W. Va. 2005).  An analysis of whether a contract term is

unconscionable necessarily involves an inquiry into the

circumstances surrounding the execution of the contract and the

fairness of the contract as a whole.  Troy Mining Corp. v. Itmann

Coal Co., 176 W. Va. 599, 346 S.E.2d 749, 753 (1986).

        A determination of unconscionability must focus on the

relative positions of the parties and the existence of meaningful

alternatives available to the plaintiffs.  Art's Flower Shop,

Inc. v. Chesapeake & Potomac Tel. Co., 186 W. Va. 613, 413 S.E.2d

670, 675 (1991).  A bargain may be unconscionable if there is

"gross inadequacy in bargaining power, together with terms

unreasonably favorable to the stronger party."  Troy Mining, 346

S.E.2d at 753.  Gross inadequacy in bargaining power may exist

where consumers are totally ignorant of the implications of what

they are signing, Board of Educ. of Berkeley County v. W. Harley

Miller, Inc., 160 W. Va. 473, 236 S.E.2d 439, 447 (1977), or

where the parties involved in the transaction include a national

corporate lender on one side and unsophisticated, uneducated

consumers on the other, <u>Arnold</u>, 511 S.E.2d at 854.

In Count I, plaintiffs allege that the December 2006 note was induced by suppression of the terms, including the possible negative amortization that accompanied the note, excessive fees and charges, and excessive valuation. (Compl. ¶ 33). Plaintiffs thus contend that the December 2006 note originated by Quicken Loans was induced by unconscionable conduct and should be found unenforceable. (<u>Id.</u> ¶ 34). In support of its motion for summary judgment, Quicken Loans contends that plaintiffs have come forward with no evidence of one-sidedness, exigent circumstances, unfair terms, or lack of meaningful alternatives. (Quicken Loans. Mem. at 6). Quicken Loans asserts that plaintiffs were experienced borrowers, having refinanced the property five times since 2002 (consisting of the two Bank One Loans and each of the three Quicken loans). Quicken Loans further emphasizes that, prior to closing on the December 2006 note, plaintiffs identified certain aspects of the proposed loan that they wanted to be changed and were able to secure what they considered to be more favorable terms. These facts, according to Quicken Loans, suggest that plaintiffs were sophisticated, considered various alternatives, and obtained loans that were fair and reasonable.

13

Plaintiffs' borrowing history does not demonstrate indisputably that they were sophisticated consumers.  In <u>Knapp v. American General Finance, Inc.</u>, this court rejected the notion that a history of obtaining loans and credit, standing alone, demonstrates that a debtor is sophisticated for purposes of an unconscionability analysis.  111 F. Supp. 2d 758, 764 (S.D. W. Va. 2000).  Indeed, notwithstanding the fact that plaintiffs have refinanced their Beckley property on at least five occasions, their deposition testimony indicates that they are largely unfamiliar with many of the provisions associated with their Quicken Loans notes.  (Pls.' Resp., Ex. A, J. Bishop Dep. at 90:4-19, 110:5-10, 111:18-23, 117:16-21; <u>Id.</u>, Ex. B, W. Bishop Dep. at 35:16-20).

Nor can the court conclude that plaintiffs are sophisticated borrowers simply because Mrs. Bishop apparently negotiated a change in the terms of the December 2006 note to avoid private mortgage insurance.  To begin, Mrs. Bishop testified during her deposition that she does not even know what private mortgage insurance is and does not remember seeking a loan that lacked private mortgage insurance.  (<u>Id.</u>, Ex. A, J. Bishop Dep. at 110:7-17).  Moreover, whether Mrs. Bishop voiced concern or not, it appears from the record that the December 2006

14

note did include private mortgage insurance.  (Quicken Loans
Mot., Ex. E. at 24).  Accordingly, there remains a genuine issue
of material fact as to whether there was gross inadequacy in
bargaining power between plaintiffs and Quicken Loans.  See
Herrod, 625 S.E.2d at 378.

        Plaintiffs have also raised a question of fact as to
whether the presence of excessive fees and excessive valuation
rendered the terms of the December 2006 note unreasonably
favorable to Quicken Loans.  See Herrod, 218 W. Va. at 618, 625
S.E.2d at 380 (concluding that loan agreements were
unconscionable in part due to excessive fees and inflated
appraisal).  As to the excessiveness of the fees, the preliminary
report of plaintiffs' expert indicates that plaintiffs incurred
settlement charges in connection with the December 2006 note
totaling approximately $8,300, in excess of 6% of the total loan
amount.  (Pls.' Resp., Ex. C at 14).  Inasmuch as West Virginia
has "enacted its own predatory lending law which prohibits the
charging of cumulative loan fees in excess of 6% of the loan
amount," the presence of such high fees here is indicative of
unconscionable terms.  Herrod, 218 W. Va. at 618, 625 S.E.2d at
380 (citing W. Va. Code § 31-17-8(m)(4)).  Equally troubling is
the rapid increase in the amount of settlement charges associated

with the Quicken loans.  For the May 2005 notes, plaintiffs paid
approximately $3,700 in fees.  That figure more than doubled to
$8,300 for both the July and December 2006 notes.  Accordingly,
the evidence before the court suggests that plaintiffs may have
been charged excessive fees unreasonably favorable to Quicken
Loans.

Plaintiffs have also raised a question of fact as to
whether the December 2006 note was the product of an inflated
appraisal.  In April 2005, Mr. Whitehair valued the property at
$112,500.  Twelve months later, in April 2006, Mr. Riffe valued
the property at $153,000, a 36% increase in value.  According to
plaintiffs' expert, Quicken Loans indicated to plaintiffs in
early 2006 that the property's anticipated value was $120,000.
(Pls.' Resp., Ex. C at 7).  Notwithstanding the disparity between
its own estimate and the 2006 appraisals, Quicken Loans issued
the July 2006 notes and the December 2006 note based on Mr.
Riffe's far higher estimates.  Quicken Loans' reliance on the
2006 appraisals is even more suspect in light of the sister-
corporation relationship between Mr. Riffe's employer (TSI) and
Quicken Loans.  When these factors are viewed together, along
with the permissible inferences taken therefrom, the court must
conclude that plaintiffs have raised at least a question of fact

16

concerning the fairness of the appraisals prepared in connection with the December 2006 note.

Finally, it is worth noting that the December 2006 note was not the product of plaintiffs' attempts to refinance. Rather, the loan resulted from active solicitation by Quicken Loans just two months after it had received the July 2006 notes. That Quicken Loans regularly and frequently contacted plaintiffs by phone and e-mail, resulting in the last two loans closed within five months of each other, further tends to support a finding of unconscionability. See Arnold, 511 S.E.2d at 861 (finding contract unconscionable in part because "the record does not indicate that the [plaintiffs] were seeking a loan, but rather were solicited by [the defendant lender]"). Accordingly, the court concludes that questions of fact remain as to the adequacy of bargaining power between the parties and the reasonableness of the December 2006 note. Summary judgment as to Count I is thus inappropriate.

B.   Count II: Illegal Loan

1.   West Virginia Code § 31-17-8(d)

Plaintiffs first allege in Count II that, within a twenty-four month period, Quicken Loans twice imposed loan

17

origination fees and investigation fees upon them, in violation of West Virginia Code § 31-17-8(d).  That provision prohibits lenders from imposing such fees twice within a twenty-four month period, "unless the new loan has a reasonable, tangible net benefit to the borrower considering all of the circumstances, including the terms of both the new and the refinanced loans, the cost of the new loan, and the borrower's circumstances."  W. Va. Code § 31-17-8(d).  Quicken Loans does not dispute that it imposed origination and investigation fees twice within a twenty-four-month period.  Rather, it contends that plaintiffs received a tangible net benefit from the loans, precluding liability under § 31-17-8(d).

Without question, plaintiffs received a reasonable, tangible net benefit from the May 2005 notes.  Specifically, plaintiffs received $26,910.97 in cash and the payment of $1,840 in unsecured debt out of the loan proceeds, compared to settlement charges totaling approximately $3,700.  Whether plaintiffs received a similar net benefit from the second and third Quicken loans remains in question.  The settlement costs accompanying the July 2006 notes increased significantly to $8,300, or more than half of the amount plaintiffs realized in cash and debt relief ($15,421.28) from the July transaction.

18

Similarly, the settlement costs incurred as a result of the December 2006 note totaled approximately $8,300, yet plaintiffs received only $1,265.35 in cash from that loan.  To be sure, a cost-benefit analysis of a consumer loan must consider more than simply settlement costs.  A borrower may well benefit from a loan, despite the presence of such high fees, if the loan, for example, secures a lower interest rate or more affordable payment terms for the borrower.  As a result of the July 2006 and December 2006 notes, however, plaintiffs were forced to pay higher interest rates and, according to their deposition testimony, face increasing payments that will soon be unaffordable.  (Pls.' Resp., Ex. A, J. Bishop Dep. at 142:10-12).

        In such circumstances, the court cannot conclude at this juncture that plaintiffs received a reasonable, tangible net benefit from the second and third Quicken loans.  Accordingly, there remains a question of fact as to whether Quicken improperly imposed origination and investigation fees twice within a twenty-four month period.  Summary judgment on plaintiffs' § 31-17-8(d) claim is thus not appropriate.

2.   West Virginia Code § 31-17-8(m)(8)

        Plaintiffs also allege in Count II that Quicken Loans

19

violated West Virginia Code § 31-17-8(m)(8).  That provision
prohibits mortgage lenders from securing "a primary or
subordinate mortgage loan in a principal amount . . . that
exceeds the fair market value of the property."  The statute
provides that a lender

> may rely upon a bona fide written appraisal of the
> property made by an independent third-party appraiser,
> duly licensed or certified by the West Virginia real
> estate appraiser licensing and certification board and
> prepared in compliance with the uniform standards of
> professional appraisal practice.

W. Va. Code § 31-17-8(m)(8).  In Count II, plaintiffs contend
that Quicken Loans violated this provision by granting them a
loan that far exceeded the market value of the property.  To
support this claim, plaintiffs proffer the retrospective
appraisal performed in 2009 that reached a lower value than the
appraisals performed in 2006 by Mr. Riffe.  (Quicken Loans Mot.,
Ex. D).  In its motion for summary judgment, Quicken Loans
apparently does not dispute that the 2009 retrospective appraisal
raises a question of fact as to the market value of the house in
2006.  Nevertheless, Quicken Loans contends that summary judgment
on the § 31-17-8(m)(8) claim is appropriate, inasmuch as Quicken
Loans relied on the 2006 appraisals of Mr. Riffe, an independent,
third-party appraiser who complied with the uniform standards of
professional appraisal practice.

In contending that Mr. Riffe was an independent, third-party appraiser, Quicken Loans emphasizes Mr. Riffe's affidavit, wherein he attests that he "did not, at any time, speak with Quicken Loans Inc. or any representative thereof, or the mortgage banker assigned to the loans relating to [plaintiffs'] property." (Quicken Loans Mot., Ex. F).  Mr. Riffe further asserts that he was never "told what value [he] should reach in [his] appraisal of the property."  (Id.).  From his affidavit, Quicken Loans asserts that Mr. Riffe was independent and that plaintiffs' § 31-17-8(m)(8) claim must be dismissed.

Notwithstanding Mr. Riffe's assertions, the court cannot conclude from this record that he was unquestionably an independent, third-party appraiser.  Plaintiffs have introduced evidence indicating a relationship between Quicken Loans and Mr. Riffe's employer, TSI.  Specifically, Mr. Clint Bonkowski, a divisional vice president of Quicken Loans, testified that his company and TSI share a parent corporation known as Rock Holdings, Inc.  That fact, in and of itself, raises a material question as to whether Mr. Riffe was an independent appraiser.

Even assuming Mr. Riffe's independence, plaintiffs have also presented evidence suggesting that his appraisal did not

comply with the uniform standards of professional appraisal practice.  Specifically, plaintiffs proffered an appraisal examination conducted by Troy Sneddon, who concluded that Mr. Riffe's 2006 appraisals violated several provisions of the Uniform Standards of Professional Appraisal Practice ("USPAP"). (Pls.' Resp., Ex. G).  For instance, Mr. Sneddon noted that Mr. Riffe's appraisals failed to include the actual dimensions of the site; misstated the property's acreage; failed to specify the zoning classification; failed to correctly identify the FEMA Special Flood Hazard Area; and failed to note the portion of the property's basement that was finished.  (Id.).  According to Mr. Sneddon, these deficiencies contravened at least nine separate provisions of the USPAP, including Standard Rule 1.1(b), which provides that an appraiser must not commit a substantial error of omission, and Standard Rule 2.1(a), which requires that an appraiser's report clearly and accurately set forth the appraisal in a manner that will not be misleading.  Mr. Sneddon concluded that, collectively, the deficiencies in Mr. Riffe's appraisals indicate that the appraisals lack credibility and "lack the necessary information for USPAP compliance."  (Id.).

        Whether the appraiser was independent and whether the cited failures constitute substantial error remain to be

22

evaluated.  Inasmuch as there is are disputed questions of fact as to whether the appraisals relied upon by Quicken Loans complied with industry standards, the court concludes that summary judgment as to plaintiffs' § 31-17-8(m)(8) claim is not appropriate.

C.   Count III: Fraud

          In order to establish a claim for fraud, plaintiffs must prove: (1) that the act claimed to be fraudulent was the act of Quicken Loans or was induced by it; (2) that the act was material and false, and that plaintiffs relied upon it and were justified under the circumstances in relying upon it; and (3) that plaintiffs were damaged because of this reliance.  See Syl. pt. 5, Kidd v. Mull, 215 W. Va. 151, 595 S.E.2d 308 (2004); syl. pt. 1, Lengyel v. Lint, 167 W. Va. 272, 280 S.E.2d 66 (1981).  In the complaint, the Count III fraud allegations, which appear to relate only to the December 2006 note, are as follows:

     39.  At the time of inducement and even at closing,
     [Quicken Loans] misrepresented and suppressed specific
     rates and terms to Plaintiffs in the loan, and
     represented the loan would be refinanced before the
     Plaintiffs' payments increased.

     40.  Defendants intentionally misrepresented these
     facts and suppressed the true cost/rate for the purpose
     of inducing the Plaintiffs to contract.

     41.  The Plaintiffs reasonably relied upon their belief

as to the low rate promised.

42.   Said misrepresentation and suppressions were
material.

(Compl. ¶¶ 39-42).  As a result, plaintiffs allege that they were
"damaged by the misrepresentation and suppressions."  (Id. ¶ 43).

As an initial matter, plaintiffs have presented
insufficient evidence to demonstrate that Quicken Loans
misrepresented or suppressed any specific material terms of the
December 2006 note itself.  Mrs. Bishop testified during her
deposition that she advised Mr. Snively that she and her husband
did not want an adjustable rate mortgage.  (Pls.' Resp., Ex. A.,
J. Bishop Dep. at 98:4-17).  Mr. Snively apparently responded by
assuring her that, although the December 2006 note included an
adjustable interest rate, Quicken Loans would refinance the
mortgage before the initial interest rate expired.  (Id. at
98:18-20).  Mr. Snively's assurances in this regard were not
included in the December 2006 note, which squarely alerted
plaintiffs that the initial interest could increase after sixty
months.  Mrs. Bishop was thus aware that the December 2006 note
contained an adjustable interest rate.  (Id. at 98:18-22, 100:21-
24).  Furthermore, although plaintiffs allege that they were
unaware of the payment options associated with the December 2006
note and the consequences of making only the minimum payment, the

24

mortgage documents that Mr. Bishop signed explain his payment options and the consequence of each.  For example, a document entitled "Fixed/Adjustable Rate Note with Payment Options," which Mr. Bishop signed, described each payment option and cautioned as follows:

> The principal balance on your loan will not be decreased by making [the minimum payment]. Additionally, because your [minimum payment] is less than the interest that has actually accrued on your Note, the Note Holder will subtract the amount of your monthly payment from the amount of the actual accrued interest and will add the difference to your unpaid principal (this is referred to as "negative amortization").

(Quicken Loans Mot., Ex. E at 28).  Plaintiffs thus knew or should have known that their loan balance would increase if they paid only the minimum amount.

Nevertheless, plaintiffs have presented sufficient evidence that Quicken Loans materially misrepresented that it would refinance the December 2006 note to a fixed-rate loan before the adjustable interest rate could increase.  Ordinarily, fraud "cannot be based on statements which are promissory in nature or which constitute expressions of intention." Croston v. Emax Oil Co., 195 W. Va. 86, 464 S.E.2d 728, 732 (1995).  Only if the plaintiff can show that the defendant did not intend to fulfill the promise at the time it was made may a promissory

statement serve as the basis of fraud.  Id.  Here, in response to concerns raised by Mrs. Bishop, Mr. Snively assured plaintiffs that the December 2006 note would be refinanced to a fixed-rate loan before any increase in the adjustable interest rate.  That Mr. Snively failed to incorporate this promise into the official loan documents surrounding the December 2006 note (which, of course, bound plaintiffs to pay an adjustable interest rate) raises a question of material fact regarding Quicken Loans' intentions to fulfill the promise at the time it was made.  See England v. MG Invs., Inc., 93 F. Supp. 2d 718, 722 (holding that lender's failure to include oral promise concerning interest rate into written loan documents raised question concerning lender's intent to abide by promise).  Accordingly, summary judgment as to Count III is inappropriate.

D.    Count IV: Fraud

          Count IV of the complaint alleges that Quicken Loans intentionally arranged for an inflated market value of plaintiffs' property for the purpose of inducing them to refinance their property.  (Compl. ¶ 46).  Plaintiffs further allege that Quicken Loans' reliance upon the inflated appraisal was intentional and material, and that plaintiffs "reasonably relied upon the origination of the loan being consistent with

prudent lending practices."   (Id. ¶¶ 47-48).

Evidence presented to the court in support of Count IV is sparse.  One might argue that the wide variance in the Riffe appraisal and the retrospective appraisal conducted in 2009 raises a question of fact not only as to the accuracy of the former but also whether it is so far off the mark as to be a materially false representation of the value of the property.

Even so, plaintiffs have failed to establish a claim for fraud based on an inflated appraisal.  As mentioned, plaintiffs must demonstrate that they reasonably relied upon the false representation.  See Syl. pt. 5, Kidd v. Mull, 215 W. Va. 151, 595 S.E.2d 308 (2004).  Although it is "not necessary that the fraudulent representations complained of . . . be the sole consideration or inducement moving the plaintiff," the representations must at least "contribute[] to the formation of the conclusion in the plaintiff's mind."  Syl. pt. 3, Horton v. Tyree, 104 W. Va. 238, 139 S.E. 737 (1927).  Plaintiffs have failed to introduce any evidence that the Riffe appraisals materially affected their decision to enter into the December 2006 note.  Indeed, plaintiffs testified that they never saw any appraisal and did not know what the property had appraised for in connection with the Quicken Loans notes.  (Quicken Loans Mot.,

27

Ex. A, J. Bishop Dep. at 80:4-7, 102:22-24; <u>Id.</u>, Ex. B, W. Bishop
Dep. at 16:11-15).

Inasmuch as plaintiffs have failed to introduce
evidence as to a necessary element of their fraud claim, namely,
that they relied on a materially false representation concerning
the value of their property, summary judgment on Count IV is
appropriate.

E.   Mrs. Bishop's Claims

Finally, Quicken Loans seeks summary judgment as to
Mrs. Bishop's claims, contending that she lacks standing to seek
relief.  Specifically, Quicken Loans maintains that, inasmuch as
Mrs. Bishop did not execute the notes, she does not qualify as a
"consumer"  under the West Virginia Consumer Credit and
Protection Act (the "WVCCPA"), thereby warranting dismissal of
her claims in Counts I and II, which are governed by the statute.
Quicken Loans further contends that Mrs. Bishop lacks standing to
assert a common law fraud claim inasmuch as she is not liable on
the December 2006 note.

1.   Counts I and II

The provision creating a private cause of action under

the WVCCPA is § 46A-5-101(1), which pertinently provides:

> If a creditor has violated the provisions of this
> chapter applying to collection of excess charges, . . .
> [or] illegal, fraudulent or unconscionable conduct . .
> . , the consumer has a cause of action to recover
> actual damages . . . .

The term "consumer" is defined in multiple provisions throughout the WVCCPA.  The parties agree that the general definition, found in § 46A-1-102(12), governs this dispute.  That provision defines the term as follows:  "'Consumer' means a natural person who incurs debt pursuant to a consumer credit sale or a consumer loan."  W. Va. Code § 46A-5-102(12).

Viewing the facts in the light most favorable to plaintiffs, Mrs. Bishop is not a consumer under the WVCCPA.  She is not in debt to Quicken Loans, nor has Quicken Loans ever accused her of being indebted to it.  Accordingly, Mrs. Bishop does not have an express cause of action under the WVCCPA.

Plaintiffs acknowledge that Mrs. Bishop did not execute the Quicken Loans notes, but contend that she is nevertheless a consumer inasmuch as she executed the deed of trust accompanying each note.  The WVCCPA's definition of consumer makes clear, however, that the debt must be incurred "pursuant to a consumer credit sale or a consumer loan."  W. Va. Code § 46A-1-102(12).  A consumer loan is defined as:

29

a loan made by a person regularly engaged in the
business of making loans in which:

    (a) The debtor is a person other than an
    organization;

    (b) The debt is incurred primarily for a personal,
    family, household or agricultural purpose;

    (c) Either the debt is payable in installments or
    a loan finance charge is made; and

    (d) Either the principal does not exceed forty-
    five thousand dollars or the debt is secured by an
    interest in land . . . .

Id. § 46A-1-102(15).  Plaintiffs' contention that Mrs. Bishop is

a "consumer" as defined by the WVCCPA because she incurred an

obligation by executing the deed of trust ignores the requirement

that the debt be incurred pursuant to a consumer loan.  Inasmuch

as the deed of trust merely serves as security for the Quicken

Loans notes, Mrs. Bishop has not incurred a debt pursuant to a

consumer loan.  See Arnold v. Palmer, 224 W. Va. 495, 503, 686

S.E.2d 725, 733 (2009) (holding that promissory note is not

enforceable against party who signed deed of trust but did not

sign promissory note inasmuch as promissory notes and deeds of

trust are separate legal documents with unique purposes).

Accordingly, the court rejects plaintiffs' contention and grants

summary judgment as to Mrs. Bishop's claims in Counts I and II.

2.   Count III

By contrast, Mrs. Bishop has standing to assert a
common law fraud claim.  To meet the constitutional minimum for
individual standing, the plaintiff must establish (1) injury in
fact, (2) causation, and (3) redressability.  See, e.g., Lujan v.
Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  The injury-
in-fact prong, which, according to Quicken Loans, Mrs. Bishop
cannot satisfy, "requires that a plaintiff suffer an invasion of
a legally protected interest which is concrete and
particularized, as well as actual or imminent."  Friends of the
Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d 149, 153
(4th Cir. 2000).  In contending that Mrs. Bishop cannot point to
an injury in fact, Quicken Loans assumes that, because Mrs.
Bishop is not liable on the December 2006 note, she will suffer
no injury as a result of the alleged fraudulent conduct.  As
plaintiffs correctly point out, however, Mrs. Bishop executed the
deed of trust and therefore stands to lose her home in the event
of default.  Inasmuch as Mrs. Bishop faces an actual, imminent,
concrete harm, she has standing to maintain the fraud claim
asserted in Count III.[3]

_____

[3] Quicken Loans' reliance on the "law of the case" doctrine
is also misplaced.  Quicken Loans maintains that the September 8,
2010, memorandum opinion and order, wherein the court dismissed

31

IV.

Pursuant to the foregoing analysis, it is ORDERED as follows:

1.  That Quicken Loans' motion for summary judgment be, and it hereby is, granted insofar as it seeks dismissal of Count IV and the claims of plaintiff Juanita Bishop in Counts I and II, and denied in all other respects;

2.  That Count IV be, and it hereby is, dismissed; and

3.  That Counts I and II be, and they hereby are, dismissed as to plaintiff Juanita Bishop.

The Clerk is directed to forward copies of this written opinion and order to all counsel of record and any unrepresented parties.

DATED:  April 4, 2011

John T. Copenhaver, Jr.
United States District Judge

---

Mrs. Bishop's claims as to Deutsche Bank and OneWest, conclusively determined that Mrs. Bishop lacked standing to assert her claims.  The September 8 ruling, however, dealt only with the contention that the complaint, on its face, lacked sufficient factual matter to demonstrate that Mrs. Bishop could maintain claims against those defendants (a contention to which plaintiffs did not respond).  Although the court concluded that the complaint was deficient in this regard, plaintiffs have since introduced evidence that Mrs. Bishop, as co-owner of the home and signatory to the deed of trust, stands to suffer actual and immediate harm, as discussed above.  Accordingly, the law of the case doctrine does not compel the court to dismiss Mrs. Bishop from this suit.